## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NATHAN NILES, and NEXLYTE INC. f/k/a CLIFTON, WEISS & ASSOCIATES, INC., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 20-05683 |
| ELIZABETH CLIFTON and STEPHEN WEISS, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## MEMORANDUM

**J. Younge**                                                    **October 18, 2023**

## I.    INTRODUCTION

Currently before this Court is Defendants' Elizabeth Clifton and Stephen Weiss' Motion for Summary Judgment.  (ECF No. 43.)  The Court finds this motion appropriate for resolution without oral argument.  Fed. R. Civ. P. 78; L.R. 7.1(f).  For the reasons set forth in this Memorandum, Defendants' Motion will be Granted.

## II.    FACTUAL BACKGROUND

Plaintiffs Nathan Niles and NexLyte, Inc. f/k/a Clifton, Weiss & Associates, Inc. (hereinafter the "Company") have filed this civil action against Defendants Elizabeth Clifton and Stephen Weiss for alleged breach of contract, fraudulent misrepresentation, and retention and misappropriation of proprietary information.  (Amended Complaint (hereinafter "Am. Compl."), ECF No. 16.)  The Company was a design-build consultancy that contracts with its clients – often governmental bodies – on large construction projects.  (Statement of Undisputed Material Facts (hereinafter "SUMF"), ¶ 29, ECF No. 43-1.)  Mr. Niles approached Defendants to purchase

the Company on July 15, 2019.  (Letter of Intent, ECF No. 43-3, pp. 58-63.)  Mr. Niles entered

into a Stock Purchase Agreement (hereinafter "Agreement") on October 25, 2019, to purchase

the Company for $3.9 million, including a Seller Note worth $585,000.  (SUMF ¶ 41, ECF No.

43-1; Seller Note, ECF No. 43-3, pp. 342-47.)  On August 28, 2020, Mr. Niles sent Defendants a

Claim Notice pursuant to the indemnification provisions of the Agreement, which Defendants

did not respond to, claiming violations of the Agreement.  (Indemnification Demand, ECF No.

46-18; Am. Compl., ¶¶ 34-37, ECF No. 16.)  Plaintiffs filed their original Complaint on

November 13, 2020.  (ECF No. 1.)  The Company ultimately ceased operations in March or

April 2022.  (SUMF, ¶ 121, ECF No. 43-1.)

      Prior to purchasing the Company, Mr. Niles and his agents conducted extensive due

diligence, including multiple visits to the Company's physical building and review of its

finances, anticipated operations, accounting software and reports, and client contracts.  (SUMF,

¶¶ 50-60, ECF No. 43-1; Legal Due Diligence Request List, ECF No. 43-3, pp. 64-81; Financial

Due Diligence Request Lists, ECF No. 43-3, pp. 82-88.)  As Mr. Niles is a certified accountant,

he did not hire other accountants to assist him in due diligence.  (SUMF, ¶ 49, ECF No. 43-1.)

Mr. Niles' lender, Bryn Mawr Trust Company, also hired Reliant Company to perform due

diligence and valuation for the Company.  (SUMF, ¶¶ 47, 62, ECF No. 43-1.)  Reliant Company

determined that the Company was worth $4.27 million, which Mr. Niles reviewed.  (SUMF ¶ 63,

ECF No. 43-1; Nathan Niles Deposition Transcript (hereinafter "Niles Dep. Tr.") 4-12-2023,

ECF No. 43-3, at 353:1-11.)  Mr. Niles was aware prior to purchase that Defendants had

repeatedly over-estimated the Company's expected profits, with the Company sometimes

underperforming by fifty percent, through his review of the summary projections.  (SUMF ¶¶ 72-

85, ECF No. 43-1.)  Defendants contend that the ultimate purchase price of $3.9 million was

approximately 3.75 times the Company's three-year average cash flow.  (SUMF, ¶ 41, ECF No. 43-1.)

Plaintiffs allege that numerous of the disclosures provided as part of the Agreement, most pertinently as they relate to the Company's Material Contracts, Government Contracts, Material Clients, and a potential prior transaction, were knowingly or recklessly false and that Mr. Niles was induced to purchase the Company under false pretenses based on these representations. (Am. Compl., ¶¶ 7, 12-33, ECF No. 16.)  Plaintiffs contend that these were fraudulent misrepresentations and violative of Sections 3.7, 3.10, 3.14, 3.19, 3.27, 3.28, and 6.1 of the Agreement and the corresponding sections of the Disclosure Schedule.  (Am. Compl., ¶ 11, ECF No. 16.)  Plaintiffs further allege that Defendants acted to wrongfully retain and misappropriate the Company's proprietary information after leaving the Company.  (Am. Compl., ¶¶ 8, 38-57, ECF No. 16.)  Plaintiffs' requested remedies include full rescission of the contract, full rescission of the Seller Note, or, in the alternative, a judgment that the remaining balance be set aside based on the alleged breach of contract and fraudulent misrepresentation, and injunctive relief from alleged retention and misappropriation of the Company's proprietary information.  *See* Am. Compl., ECF No. 16.  The Plaintiffs also set forth alternative remedy theories and expectation damages.  *See* Am. Compl., ECF No. 16; Plaintiffs' Statement of Additional Undisputed Material Facts (hereinafter "Pls.' SAUMF"), ¶ 128, ECF No. 45-1.

### a. Material Contracts

Representations made as to the accuracy of the Disclosure Schedule, attached to the Agreement, are considered (1) in the introductory paragraph of Article III of the Agreement, "Representations and Warranties of Sellers and the Company," and (2) the Disclosure Schedule

itself.  The Article III "Representations and Warranties of Sellers and the Company" reads, in

relevant part:

> Sellers and Company represent and warrant, jointly and severally, to Buyer that the statements contained in this Article III are true and correct as of the date hereof and as of the Closing Date . . . except as set forth in the schedule attached to this Agreement setting forth exceptions to the representations and warranties set forth herein (the 'Disclosure Schedule').

(Agreement, ECF No. 43-3, pp. 208-09.)  The referenced Disclosure Schedule reads, in relevant

part:

> The Disclosure Schedules are qualified in their entirety by reference to the Agreement and do not constitute, and shall not be construed as constituting representations, warranties or covenants of the Company or the Sellers, except as and to the extent provided in the Agreement . . .
>
> The inclusion of any items or information, including dollar amounts, in this Company Disclosure Schedule, shall not be construed as an admission that such item or information . . . is 'material,' nor shall the inclusion of such item . . . establish a standard of materiality for any purpose whatsoever . . .
>
> Where the terms of a contract or other disclosure item have been referenced, summarized or described, such reference, summary or description does not purport to be a complete statement of the material terms of such contract or disclosure item and such disclosures are qualified in their entirety by the specific details of such contract or disclosure item.

(Disclosure Schedule, ECF No. 43-3, p. 258.)  Section 10.7 of the Agreement provides that the

Agreement, and the attached Exhibits and Disclosure Schedule, represent the parties' entire

contract.  (Agreement, ECF No. 43-3, p. 244.)

Material Contracts are considered at Section 3.14(a) of the Agreement, which states that

the Seller shall provide a list of Material Contracts in the attached disclosures, that such

disclosures are true and accurate, and that the contracts listed are in full force and effect.

(Agreement, ECF No. 43-3, p. 217-18.)  Disclosure Schedule 3.14(a) of the Agreement identified

thirty (30) contracts and listed the total expected value of the contract, the amount already

invoiced, the amount left to be invoiced, and the anticipated completion date.  (Disclosure Schedule, ECF No. 43-3, p. 317.)  Of these thirty (30) contracts, Plaintiffs have identified ten (10) of them as being already expired, inactive, listed with remaining value although that remaining value was not owed to the Company (and was instead owed to other partners on the project), or, due to circumstances known by Defendants, worth less than stated.  (Pls.' SAUMF, ¶¶ 222-301, ECF No. 45-1.)  Plaintiffs identified these contracts as MBTA PTC, PAAC BRT, IndyGo BRT, MNR New Haven, PAAC Berry Street, NYCT Canarsie, SEPTA Jefferson, GCRTA PLC, MNR Brewster Yard, and EWR Change Order.  (Pls.' SAUMF, ¶¶ 222-301, ECF No. 45-1.)  Of these, SEPTA Jefferson, GCRTA PLC, MNR Brewster Yard, and EWR Change Order were noted in the disclosures for Section 3.14(a) with an asterisk identifying them as "CWA Contract[s] under negotiation."  (Disclosure Schedule, ECF No. 43-3, p. 317.)  Mr. Niles has stated that his understanding of the asterisk is that "there was a minor item to be worked out."  (Niles Dep. Tr. Volume I, ECF No. 46-1, at 137:1-10.)  In total, Plaintiffs attribute a difference of between $531,433 and $1,120,269 in the value represented to them and the actual value to these alleged misrepresentations.  (Pls.' SAUMF, ¶ 128, ECF No. 45-1.)

The review of client contracts was part of Plaintiffs' due diligence.  (SUMF ¶¶ 55-56, ECF No. 43-1; Niles Dep. Tr. Vol. II, ECF No. 46-2, at 272:5-10.)  However, some of the contracts identified in Disclosure Schedule 3.14(a) had been deleted and therefore were not seen by Mr. Niles.  (Niles Dep. Tr. Vol. II, ECF No. 46-2, at 272:5-10.)  Despite this, Mr. Niles proceeded with the purchase because "[the Defendants] represented that [the contracts] were in full force and effect" and "it's not unusual for a business of this size . . . to not have great recordkeeping."  (Niles Dep. Tr. Vol. I, ECF No. 46-1, at 170:6-7, 170:10-12.)

b. Change of Relationship With Material Client

Massachusetts Bay Transportation Authority (hereinafter "MBTA") is a Material Client as defined under the Agreement.  (Agreement, ECF No. 43-3, p. 223.)  Plaintiffs' Expert Report identifies MBTA as one of the Company's two biggest client's and calculates that the loss of their business would result in a 37.5% reduction in its valuation.  (Expert Report of Jeffrey Buchakjian, ECF No. 43-3, p. 415.)  The Agreement represents that there are no Material Clients that have indicated an intention to alter their business relationship with the Company and that no facts exist that would be reasonably likely to alter a business relationship with a Material Client. (Agreement, ECF No. 43-3, pp. 222-23.)

The parties dispute whether Defendants knew of and failed to disclose that not only would the remaining construction for the MBTA PTC contract not be completed but that there would be no further relationship with MBTA's prime contractor, Hitachi, Ltd., severely limiting any future work with MBTA.  (Pls.' SAUMF, ¶¶ 237, 311, ECF No. 45-1.)  The Company's Senior Director of Systems Integration, and the Project Manager for the MBTA PTC project at the time, Todd Ellis, stated that, in 2018, Defendant Stephen Weiss told him "not to expect to get any additional work with MBTA" because Christopher Singer, a member of the purchasing department at Hitachi, Ltd., did "not want to work with [the Company] on any additional projects."  (Todd Ellis Declaration, ¶ 22, ECF No. 46-5.)  Mr. Weiss denies making any such statement or having any contact with Mr. Singer, and instead identified negotiations with MBTA that continued after 2018.  (Stephen Weiss Declaration, ¶¶ 8-9, 10-19, ECF No. 51-3, pp. 103-04.)  Mr. Niles stated that, on a 2020 phone call with a representative of Hitachi, Ltd., that he was told that there would be no further work between the two companies and that this was known by the Defendants.  (Pls.' SAUMF, ¶ 311, ECF No. 45-1.)  Plaintiffs attribute a $1.6

million difference in estimated value to the alleged undisclosed dissolution of that relationship.

(Pls. SAUMF, ¶ 128, ECF No. 45-1.)

### c. Accounts Receivable Report

The Agreement represents that the Accounts Receivable reports are true and complete.

(Agreement, ECF No. 43-3, pp. 211-12.)  The Agreement also contains a true-up provision that

created remediation procedures for over- or under-estimates of liabilities post-closing.

(Agreement, ECF No. 43-3, pp. 207-08.)  The Defendants have conceded that "[t]here were

approximately $100,000 in liabilities missed" in the financial statements provided to Plaintiffs.

(Defendants' Mediation Submission, ECF No. 47-10, p. 5.)

### d. Sology, Inc.

The parties dispute whether Defendants made a material omission in explaining to

Plaintiffs why a potential deal with Sology, Inc. (hereinafter "Sology") for the sale of the

Company had fallen through.  (Am. Compl., ¶¶ 108-112, ECF No. 16.)  Section 3.28 of the

Agreement states:

> No representation or warranty by sellers or the Company in this agreement and no
> statement contained in the Disclosure Schedule to this Agreement or any certificate or
> other document furnished or to be furnished to Buyer pursuant to this Agreement
> contains any untrue statement of a material fact, or omits to state a material fact necessary
> to make the statements contained herein, in light of the circumstances in which they are
> made, not misleading.

(Agreement, ECF No. 43-3, p. 228.)  The parties agree that Sology and the Company had a

confidentiality agreement regarding its prior negotiations.  (Niles Dep. Tr. 4-11-2023, ECF No.

43-3, p. 92, at 46:12-48:21.)  However, Defendants had allegedly told Mr. Niles that the deal fell

through because it "wasn't serious."  (Pls. SAUMF, ¶ 221, ECF No. 45-1.)  Sology's

representative, Edwin Christmas, stated that it was concerns about the Company's financial

projection that led them to restructure the deal, after which the deal did not proceed.  (Edwin

Christmas Deposition Transcript Volume II, ECF No. 46-20, at 68:21-22, 71:4.)  Plaintiffs then

allege that Defendants offered the Company to Mr. Niles for $1 million more than they had

offered it to Sology.  (Pls.' SAUMF, ¶ 153, ECF No. 45-1.)  Plaintiffs claim that failing to

accurately explain the reasons behind not proceeding with the deal, and then providing Plaintiffs

with similar valuations, was in breach of Defendants' contractual obligation not to mislead.

(Am. Compl. ¶¶ 27-28, 30-31.)

### e. Proprietary Information

Attached and incorporated into the Agreement is the Proprietary Information, Inventions

and Restrictive Covenants Agreement (hereinafter "PIIRCA"), which states at Section 5 that the

parties agree to "deliver to the Company any and all [materials] containing or disclosing any

Company Inventions, Third Party Information or Proprietary Information of the Company."

(PIIRCA, ECF No. 43-3, pp. 363-64.)  Additionally, as part of the Agreement, Defendants

agreed to a noncompete clause and to keep the Company's proprietary information confidential.

(Agreement, ECF No. 43-3, pp. 233-35.)

The parties dispute the scope of the Defendants' alleged retention and misappropriation

of the Company's proprietary information.  Following the end of Defendants' work with the

Company on August 11, 2020, Plaintiffs allege that Defendants requested that a Company

employee recreate their Company accounts to provide them unauthorized access, requested that

that employee transmit Company email correspondence and documents with proprietary

information to them, and retained a hard drive with proprietary information, despite requests for

its return, until April 17, 2023.  (Am. Compl., ¶¶ 44-53, ECF. No. 16; Defendants'

Memorandum, ECF No. 43, p. 41.)  Defendants have denied that any documents belonging to the

Company had ever been transmitted to the Defendants but concede that they retained a hard

drive containing Company materials until April 17, 2023, three years after the end of their employment with the Company.  (Defendants' Answer to the Amended Complaint (hereinafter "Defs.' Answer"), ¶ 48, ECF No. 20.; Defendants' Memorandum, ECF No. 43, p. 41.)  Plaintiffs have stated that the alleged transmission, retention, and misappropriation of proprietary information have "caused and will continue to cause damage to Plaintiffs, in an amount to be proven at trial."  (Am. Compl., ¶ 101, ECF No. 16.)

Plaintiffs now seek rescission of the Agreement and Seller Note due to the alleged breach of contract and fraudulent misrepresentations, as well as damages associated with the violation of the PIIRCA and injunctive relief preventing further retention and misappropriation of the Company's proprietary information.  If rescission is not granted, Plaintiffs alternatively seek damages for unjust enrichment and to set aside the remaining balance due on the Seller Note. Plaintiffs have also alternatively calculated expectation damages.  (Pls.' SAUMF, ¶ 128, ECF No. 45-1.)

Plaintiffs filed their original thirteen-count Complaint on November 13, 2020.  (ECF No. 1.)  This Court granted Defendants' Motion to Dismiss Counts VII (Federal Defend Trade Secrets Act), VIII (Pennsylvania Trade Secrets Act), IX (Computer Fraud and Abuse Act), XI (Tortious Interference), and XIII (Conversion) on September 27, 2021.  (ECF No. 13.)  Plaintiffs subsequently filed an eight-count Amended Complaint on October 27, 2021.  (ECF No. 16.) Defendants filed the Motion for Summary Judgment now considered by the Court on July 13, 2023.  (ECF No. 43.)

## III.   LEGAL STANDARD

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012).  To defeat a motion for summary judgment, there must be a factual dispute that is both material and genuine. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 24-49 (1986); *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008).  A material fact is one that "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248.  A dispute over a material fact is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Id*.

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016).  When the movant is the defendant, they have the burden of demonstrating that the plaintiff "has failed to establish one or more essential elements of her case." *Burton v. Teleflex Inc.,* 707 F.3d 417, 425 (3d Cir. 2013).  If the movant sustains their initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At the summary judgment stage, the court's role is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  *See Anderson*, 477 U.S. at 249; *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *See Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001). Nonetheless, the court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## IV.     DISCUSSION

Plaintiffs have alleged that Defendants (A) breached the parties' Agreement as to the Company's disclosures, (B) breached the parties' Agreement as to Defendants' obligation to return proprietary information after ceasing their relationship with the Company, and (C) fraudulently misrepresented the Company's value through these representations, inducing Mr. Niles to purchase the Company under false pretenses.  As Plaintiffs have brought this action pursuant to the Eastern District of Pennsylvania's diversity jurisdiction, 28 U.S.C. § 1332, the Court will consider these claims under Pennsylvania law.  The Court finds that the Plaintiffs have failed to establish the elements for a breach of contract cause of action on either claim. Additionally, the Court finds that Plaintiffs' claim of fraudulent misrepresentation is both barred by the gist of the action doctrine and insufficiently supported.

### A.     The Defendants Did Not Breach the Agreement as to Representations Made in Defendants' Disclosures.

Under Pennsylvania law, a plaintiff bringing a breach of contract action must establish "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages."  *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).  "It is firmly settled that the intent of the parties to a written contract is contained in the writing itself.  *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 613 (3d Cir. 1995).  The factfinder may examine relevant extrinsic evidence to determine the parties' mutual intent only where the writing is ambiguous.  *Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1424 (3d Cir. 1994).  "A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered

ambiguous by the mere fact that the parties do not agree on the proper construction." *Duquesne Light*, 66 F.3d at 614 (quoting *Samuel Rappaport Family P'ship v. Meridian Bank*, 657 A.2d 17, 21-22 (Pa. Super. Ct. 1995)).  Here, the existence of a valid contract is not in question. However, Plaintiffs have failed to establish that the Defendants breached any imposed duty.

### 1.    *Material Contracts*

Plaintiffs allege the Defendants breached the Agreement by misrepresenting the status of the Company's then existing contracts and the remaining value on them in Section 3.14(a) of the Agreement through the inclusion of contracts that had expired, were inactive, or worth significantly less than stated.  While the Court accepts the Plaintiffs' allegations of inaccuracies in the disclosure attached to Section 3.14(a) of the Agreement for the purposes of evaluating Defendants' Motion, it disagrees that these inaccuracies represent a breach of the Agreement because such discrepancies are contemplated and addressed within the Agreement itself.

Section 3.14(a) of the Agreement provides that "[E]ach Material Contract is valid and binding on the Company in accordance with its terms and in full force and effect" and that the representations made in Article III are true "except as set forth in the [Disclosure Schedule]." (Agreement, ECF No. 43-3, pp. 208-09, 217-18.)   Section 3.14(a) is silent as to the value of these contracts.  (Agreement, ECF No. 43-3, pp. 208-09).  In the Disclosure Schedule itself, it specifically states that the terms of the contracts that have been "referenced, summarized or described . . . *[do] not* purport to be a complete statement of the material terms of such contract . . . and such disclosures are *qualified in their entirety by the specific details of such contract*" (emphasis added).  (Agreement, ECF No. 43-3, p. 258.)  At another point in the Agreement, it states that there has been no "[3.10](k) acceleration, termination, material modification to or

cancellation of any Material Contract . . . *other than in accordance with its terms*" (emphasis added).  (Agreement, ECF No. 43-3, pp. 212-13.)

As indicated in the Disclosure Schedule, where its representation conflicted or did not account for the full details of the relevant contracts, it is the specific terms of the contracts that control.  The Agreement makes clear that the table provided in the disclosure for Section 3.14(a) does not, and arguably cannot, paint a fully accurate picture of each contract, the terms surrounding its performance, how the remaining value was calculated, the progress of the project, or other conditions that might be expected to impact the performance and value of a contract.  Mr. Niles and his agents were granted access to all of the contracts that Defendants had in their records during the due diligence period and had the ability to evaluate the material terms of those contracts as described in the Disclosure Schedule.  It would be a stretch for this Court to find that Defendants had breached the Agreement by quantifying a remaining value that was, for certain contracts, ultimately inaccurate when the Agreement specifically provides that reference to the contracts themselves is necessary to understand their material terms.  To the extent that Plaintiffs did not have access to all of the contracts and proceeded with the deal despite some of them being deleted, this does not erase that disclaimer.  As such, the Court finds that the representations provided in the disclosures to Section 3.14(a) were not violative of the Agreement.

### 2.      *Failure to Disclose Change in Material Client Relationship*

Plaintiffs allege that Defendants breached the Agreement by failing to disclose that the Company's relationship with MBTA's prime contractor had dissolved, resulting in the MBTA PTC contract, noted in Section 3.14(a) of the Disclosure Schedule, not going forward and in the potential for future projects being severely limited.  Allegedly, Defendants' awareness that there

would be neither further work on existing contracts nor, likely, any more contracts between the Company and MBTA is demonstrated by Defendant Stephen Weiss having told the Company's MBTA PTC project manager this in 2018. Despite this alleged awareness, there is no such disclosure provided in the Disclosure Schedule.

Although this Court is obligated to accept the Plaintiff's version of these facts as true for the purpose of evaluating the Defendants' Motion, this is not sufficient for the Court to infer that the client relationship with MBTA had an anticipated breakdown that triggered an obligation on the part of Defendants to inform Plaintiffs the contract was ending. Mr. Weiss's alleged statement offers at best a prediction of future action, and this prediction is belied by the record indicating that negotiations with MBTA continued despite any perceived difficulties with its prime contractor. *See* Stephen Weiss Declaration Exhibit 1, ECF No. 51-3, pp. 109-19. Nor is it clear to the Court that an alleged personal disagreement with a singular member of the purchasing department of MBTA's prime contractor could be expected to so inhibit the ability of the Company to continue to work with MBTA that Defendants should be subjected to liability for its nondisclosure. As such, the Court finds that Defendants did not breach their obligations under Section 3.19 of the Agreement.

### 3. *Accounts Receivable Liabilities*

Plaintiffs allege that Defendants breached the Agreement by under-valuing the Company's liabilities by at least $100,000 due to accounting inaccuracies. Section 3.7 of the Agreement states that the Company's financial statements "present fairly, in all material respects, the financial position and the results of operations of the Company" and that the Accounts Receivable report is "true, correct, and complete." The Agreement provides that, where "the Actual Indebtedness is greater than the Estimated Indebtedness, the Sellers shall pay to Buyer an

amount . . . equal to the difference," defined as a 'True-Up Payment,' upon receipt of the Buyer's

Post-Closing Statement calculating the actual amount of indebtedness, to be received within

ninety (90) days of closing.  (Agreement, ECF No. 43-3, pp. 207-08.)  The Agreement, by its

own terms, contemplates the possibility that estimated liabilities could be higher than disclosed.

Plaintiffs' allegation that such estimations were "inaccurate, understated, and otherwise not

calculated in accordance with [GAAP]" (Am. Compl., ECF No. 16, pp. 3-4) is not sufficient to

support a breach of contract claim where the contract itself treats such an occurrence as

reasonably anticipated and a remedy is provided therein as part of the post-closing process.  The

contractual duty associated with the alleged understatement, as outlined in the Agreement, is to

follow through with the post-closing true-up process when required, not to entirely avoid its

potential necessity.

4.       *Prior Potential Transaction*

Plaintiffs allege that Defendants breached the Agreement by failing to disclose that a

prior potential transaction to sell the Company to Sology had fallen through due to concerns

about the Company's financial projections.  There is nothing in the Agreement that explicitly

requires such a disclosure.  However, Plaintiffs point to Section 3.28, which states that

Defendants will not make "any untrue statement of a material fact, or omit[] to state a material

fact necessary to make the statements contained [in the Agreement] . . . not misleading."  The

Court is not convinced that the reasons behind not closing with Sology is a material fact that

made the representations in the Agreement misleading through its omission.  That Sology was

not satisfied with the financial condition of the Company, after having access to the same

information as Plaintiffs, has little to no bearing on whether Plaintiffs, after reviewing that same

information, should consider the Defendants' representation of the Company's financial position

valid or not.  While Plaintiffs may argue that, through this, Defendants knew or should have known that they were over-valuing the Company, the omission itself is not material to the Agreement between the parties and cannot be considered as misleading Plaintiffs as to the Agreement's terms.  Therefore, the Court does not find this nondisclosure violative of the Agreement.

### B.      The Defendants Did Not Breach the PIIRCA.

The Plaintiffs have failed to allege facts sufficient for the Court to find that damages resulted from the retention of proprietary information in contradiction of the Agreement.  To prove damages under a breach of contract cause of action, the plaintiff must give a factfinder "evidence from which damages may be calculated to a 'reasonable certainty.'"  *Ware*, 322 F.3d at 225-26 (quoting *ATACS Corp. v. Trans World Comms., Inc.*, 155 F.3d 659, 668 (3d Cir. 1998)).  The calculation behind 'reasonably certain' damages must not be "too speculative, vague or contingent upon an unknown factor."  *ATACS*, 155 F.3d at 669.  Although mathematical certainty is not necessary to find that the element has been met, a plaintiff must still introduce "sufficient facts upon which the [factfinder] can determine the amount of damages without conjecture."  *Delahanty v. First Pennsylvania Bank*, N.A., 464 A.2d 1243, 1257 (Pa. Super. 1983).  Plaintiffs have failed to do this here.

It is conceded by Defendants that, for approximately three years, they had retained a hard drive containing some of the Company's materials and that they had requested that a Company employee forward them an email related to another business that they own (not the Company). (Defendants' Memorandum, ECF No. 43, p. 41; Defs.' Answer, ¶ 48, ECF No. 20.)  Retention of the hard drive conflicted with the provision in Section 5 of the PIIRCA that such materials be returned if it contained the Company's proprietary information.  *See* PIIRCA, ECF No. 43-3, pp.

363-64.  Notably, the PIIRCA specifically contemplates that the parties will engage with each

other post-closing to address "any continuing obligations under this Agreement."  (PIIRCA, ECF

No. 43-3, p. 364.)  The Court does not find that the Defendants breached the PIIRCA by mere

retention of the hard drive where the PIIRCA itself addresses the potential need for further

cooperation to comply with its provisions and the proper resolution – the return of the hard drive

– has been reached.

Plaintiffs have failed to allege with any specificity any further proprietary information

that was contained thereon that has not been returned or to express what damages resulted from

the retention other than that they resulted and will continue.  The Court cannot base an award of

damages or injunctive relief on vague assertions of injury and speculative future damage which

are insufficiently alleged.  *See ATACS*, 155 F.3d at 670 (finding that unknown variables,

"unsubstantiated speculation and conjecture cannot form the basis of recovery").  No evidence as

to the amount of proprietary information allegedly retained by Defendants, or of its use over the

previous years, has been submitted to the Court to show either the extent, or even existence, of

damage.  As such, the Court finds that the Plaintiffs have failed to establish a cause of action for

breach of the PIIRCA.  Lacking a concrete basis from which to surmise that there is a continuing

risk of breach of the PIIRCA, the Court finds that the Plaintiffs are not entitled to injunctive

relief on this matter.

### C.   The Fraudulent Misrepresentation Claim is Barred by the Gist of the Action Doctrine and, Otherwise, Insufficiently Established.

As the root of Defendants' obligation to accurately disclose the Company's financial and

business condition to the Plaintiffs is contained in the Agreement, the Court finds that Plaintiffs'

tort-based claim for fraudulent misrepresentation is barred by the gist of the action doctrine.

Under Pennsylvania law, a plaintiff cannot "recast[] ordinary breach of contract claims into tort

claims." *Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.*, 256 F. Supp. 2d 329, 340 (E.D. Pa. 2003). This doctrine "maintain[s] the distinction between" tort and contract theories. *Id.* The gist of the action doctrine requires the court to determine what the "essential nature of the claim alleged" is by determining the basis of the source of the duties breached. *Caudill Seed & Warehouse Co. v. Prophet 21, Inc.*, 123 F.Supp.2d 826, 833 (E.D. Pa. 2000). Tort claims that arise "independently of the underlying contract" and where the contract is "merely collateral" to the cause of action alleged are not barred by this doctrine. *Invs. Tr. LC v. TD Bank*, No. CV 11-1551, 2011 WL 13141657, at *1 (E.D. Pa. May 26, 2011); *but see Galdieri v. Monsanto Co.*, 245 F.Supp.2d 636, 650 (E.D. Pa. 2002) ("[A] breach of contract claim cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently induced'"). However, duties that "flow from an agreement between the parties [are] contractual in nature." *Caudill Seed*, 123 F.Supp.2d at 833.

Plaintiffs argue that the duty to be honest is a broader and independent societal duty that is separate and distinct from Defendants' contractual obligations. While honest dealing is certainly something that is desired and expected from society at large, the Court disagrees that the source of Defendants' obligation is independent of the Agreement. The Agreement itself provides the basis for the relationship between the parties giving rise to the obligation and defines the specific expectations of disclosure that Plaintiffs have rooted their action in. Here, Plaintiffs allege that the Defendants provided, or failed to provide, truthful information and documentation as they were required to do under the Agreement. Therefore, Plaintiffs' claims relate specifically to their performance of their contractual obligations. *See Wilmington Fin., Inc. v. Am. One Fin., Inc.*, No. CIV.A. 06-5559, 2007 WL 2221424, at *2 (E.D. Pa. July 31, 2007) (finding that parties that, in accordance with a contract, had provided certain information

and documentation that they knew was false were performing a duty arising under the contract, not a broader social policy).

These duties are intertwined with, not separate and distinct from, those arising under a contract, and are not analogous to those in other cases that have found tort claims not barred by the gist of the action doctrine. *See Rahemtulla v. Hassam*, 539 F.Supp.2d 755, 779 (M.D. Pa. 2008) (finding fiduciary duties between partners separate and distinct from their contractual duties); *Dansko Holdings, Inc. v. Benefit Trust Co.*, 991 F.3d 494, 501 (3d Cir. 2021) (finding a tort claim where a party lied about a side issue and therefore violated "a social duty not to lie to business partners," not the terms of the contract); *Earl v. NVR, Inc.*, 990 F.3d 310, 315 (3d Cir. 2021) (false representations that were made before the formation of the contract were collateral to the contract itself). Fraud claims concerning only the performance of outlined contractual duties cannot be considered separate duties. *eToll, Inc. v. Elias/Savion Advert., Inc.*, 811 A.2d 10, 19 (Pa. Super. 2002). Though some of these alleged misrepresentations were made prior to actual contract formation, a false misrepresentation claim is still barred by the doctrine where the precontractual representations were subsequently and specifically outlined in the resultant contract, as they created the same duties. *Integrated Waste Sols., Inc. v. Goverdhanam*, Civ. A. No. 10-2155, 2010 WL 4910176, at *13 (E.D. Pa. Nov. 30, 2010); *Zaftr Inc. v. Lawrence*, No. CV 21-2177, 2023 WL 349256, at *23 (E.D. Pa. Jan. 20, 2023). The parties here are contracting parties who made representations of honesty specific to the terms of the Agreement. The Court cannot create a tort claim from one so clearly rooted in contractual obligations.

Even if the Court found that this claim was not barred by the gist of the action doctrine, the Plaintiffs have failed to present sufficient evidence of fraudulent misrepresentation. Under Pennsylvania law, the plaintiff must be able to show "(1) a misrepresentation, (2) a fraudulent

utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as a proximate result." *Delahanty*, 464 A.2d at 1252. Representations "as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations" even if they end up being wrong. *Coleman v. Sears, Roebuck & Co.*, 319 F. Supp. 2d, 551 (W.D. Pa. 2003) (citations omitted). Justifiable reliance is considered based on an individual's knowledge, experience, and competence. *Am. Metal Fabricators Co. v. Goldman*, 323 A.2d 891, 894 (Pa. Super. Ct. 1974).

As discussed above, the Defendants, in providing representations as to the value of the Company and its contractual relationships, met their obligations as set forth in the Agreement. The Plaintiffs have failed to establish that the Defendants' alleged misrepresentations amounted to more than incidental inaccuracies or attempts at summarizations of complicated terms, which are eventualities accounted for in the Agreement, or that any alleged omissions amounted to misrepresentations. Likewise, Plaintiffs have failed to establish that Defendants offering a purchase price beyond what Plaintiffs now believe was the value of the Company was fraudulent. *See In re Burlington Coat Factory Securities Litig.*, 114 F.3d 1410, 1428 n. 14 (3d Cir. 1997) ("[S]tatements of optimism have been held not actionable as a matter of law because they constitute no more than 'puffery' and are understood by reasonable investors as such"); *see also In re Crown American Realty Trust*, No. Civ.A. 95-202J, 1997 WL 599299, at *8 (W.D. Pa. Sept. 15, 1997) (finding that optimistic future predictions are only actionable if they foster a belief in a specific and definite outcome.) As Mr. Niles was aware, the Company frequently underperformed Defendants' expectations, and Mr. Niles made the decision to proceed with the purchase anyways. That Mr. Niles purchased the Company for more than he now believes it to

be worth does not amount to a fraud.  As such, the Court finds that the Plaintiffs have failed to establish facts sufficient to support a claim of fraudulent misrepresentation.

**D.      Plaintiffs Are Not Entitled to Equitable Relief.**

Plaintiffs are not entitled to equitable relief as they have failed to establish a breach of the Defendants' obligations.  *See Siegel v. Goldstein*, No. Civ. A. No. 19-2890, 2023 WL 2139825, at *5 (E.D. Pa. Feb. 21, 2023) ("Equitable relief for breach of contract is still predicated on finding a breach in the first place – *i.e.*, an underlying injury").  As this Court has found neither a breach of contract nor an actionable claim for fraudulent misrepresentation, it finds that the Plaintiffs are not entitled to rescission of the Seller Note or the Agreement or to have them declared void.  Similarly, Plaintiffs cannot succeed on their claim for unjust enrichment.  While an unjust enrichment claim may be pled as an alternative to a breach of contract claim, "they may plead this claim in the alternative [only] when there is a dispute about the existence or validity of a contract."  *Holovich v. Progressive Specialty Ins. Co.*, 600 F. Supp. 3d 572, 582 (E.D. Pa. 2022) (quoting *Buccigrossi v. Thomas Jefferson Univ.*, Civ. A. No. 21-cv-221, 2022 WL 1093127, at *4 (E.D. Pa. Apr. 12, 2022)); *see also Benefit Tr. Life Ins. Co. v. Union Nat'l Bank of Pittsburgh*, 776 F.2d 1174, 1177 (3d Cir. 1985) (finding equitable relief "inapplicable when the relationship between the parties is founded on a written agreement or express contract").  As the validity of the Agreement remains unchallenged, this claim does not apply.

**V.      CONCLUSION**

For the foregoing reasons, the Defendants' Motion for Summary Judgment is Granted.  An appropriate Order follows.

**IT IS SO ORDERED.**

BY THE COURT:
/s/ John Milton Younge
**Judge John Milton Younge**